819 P.2d 931

**S.K. DRYWALL, INC., an Arizona corporation, d/b/a Sunland Drywall & Paint, Plaintiff–Appellee Cross–Appellant,**

v.

**DEVELOPERS FINANCIAL GROUP, INC., an Arizona corporation; Fidelity & Deposit Company of Maryland, a Maryland corporation, Defendants–Appellants Cross–Appellees.**

No. CV–90–0302–PR.

Supreme Court of Arizona,
En Banc.

Oct. 31, 1991.

**346**

John L. Dillingham, P.C. by John L. Dillingham, Phoenix, for plaintiff-appellee cross-appellant.

Nearhood & Associates by James R. Nearhood, Phoenix, for defendants-appellants cross-appellees.

## OPINION

FELDMAN, Vice Chief Justice.

We granted this petition for review, brought by Sunland Drywall, Inc. (Sunland), to determine whether a subcontractor's mechanic's lien filed on a multi-building condominium project is timely, under A.R.S. § 33–993(A), when filed within sixty days of completion of the last work done on any building in the project. Rule 23, Ariz. R.Civ.App.P., 17B A.R.S. We have jurisdiction pursuant to article 6, § 5(3) of the Arizona Constitution and A.R.S. § 12–120.-24.

## FACTS AND PROCEDURAL HISTORY

The facts in this case are undisputed and are set forth in detail in the court of appeals' opinion. *S.K. Drywall, Inc. v. Developers Financial Group, Inc.*, 165 Ariz. 588, 799 P.2d 1362 (Ct.App.1990). Developers Financial Group (DFG) is the owner and developer of The Courts at Gainey Ranch (the project), a multi-building condominium complex consisting of seventy units in eleven detached buildings, along with a swimming pool, ramada, landscaping, streets, and driveways owned in common by the homeowners. DFG recorded a plat map on the project showing the separate buildings numbered from 1 to 11, though the buildings are not identified by these numbers in the residential community. Each unit within the project has a separate legal description.

DFG hired Drongo, Inc. (Drongo), a general contractor, to construct the eleven buildings and other improvements. In a contract dated October 30, 1985, Drongo agreed to complete the work on the eleven buildings for a total sum of $3,241,320. Article 3 of the contract states that the total sum was determined from a schedule of values, which was attached to the contract, that categorized the work to be performed and its price.

Drongo subcontracted with Sunland for drywall and stucco work on the project. Sunland agreed to do the drywall work on all eleven buildings for a total sum of $211,100 and the stucco work for a total sum of $172,000. In both cases, the contract price was determined by a breakdown of the price per building, in recognition of the fact that some buildings contained more units than others.

The terms of Sunland's drywall and stucco contracts (Sunland contract) are similar to those of DFG's contract with Drongo (DFG contract). Sunland was to receive monthly progress payments based on ninety percent of the current month's completed labor, materials, and equipment costs. In both the DFG and Sunland contracts, billing applications for the monthly progress payments were to be submitted with lien waivers for the previous month's payments. The ten percent retention on each building was payable within thirty days of occupancy of any unit in the building and not more than ninety days after acceptance of the building by the owner. Sunland provided drywall labor and materi-

als for the ramada and buildings 5, 6, 7, 8, 9, and 10. Sunland provided stucco labor and materials for buildings 5 and 6. Buildings 7, 8, and 9 were under construction at the same time. The other buildings were constructed one at a time.

In January 1987, Drongo quit work on the project and filed for bankruptcy. Sunland then ceased work on the project. Sunland properly recorded and served an amended notice and claim of lien for work done on the project. Pursuant to A.R.S. § 33–1004, DFG procured a lien discharge bond from Fidelity & Deposit Co. of Maryland in the amount of $38,591.33.[1] In the trial court, the parties stipulated to the following schedule of completion dates and charges for Sunland's drywall and stucco labor and materials:

| BUILDING | DATE COMPLETED | AMOUNT |
|---|---|---|
| Building 7 | May 5, 1986 | 3,448.73 |
| Ramada | May 15, 1986 | 212.70 |
| Building 8 | July 1, 1986 | 2,089.73 |
| Building 9 | July 18, 1986 | 2,089.73 |
| Building 5 | November 4, 1986 | 6,990.63 |
| Building 6 | January 9, 1987 | 8,032.84 |

Sunland's lien was filed March 4, 1987, fifty-four days after completion of work on building 6. DFG argued that the lien was invalid as to all of the buildings, and that it was untimely as to all of the buildings except building 6. On cross-motions for summary judgment, the trial court granted judgment to Sunland.

On appeal, the court of appeals held the lien valid, but a majority held that the lien was time-barred as to all buildings except building 6 under A.R.S. § 33–993, which provides that a lien is timely if filed "within sixty days after the completion of a building, structure or improvement." The court stated:

> Although we do not rule out the possibility that a multi-building project could be deemed an "improvement" within the meaning of A.R.S. § 33–993 on appropriate facts, no such facts are present here. The contractual arrangements between the parties in this case, and the manner in which the buildings in DFG's condominium development were actually constructed, require the conclusion that each constituted a separate "building" within A.R.S. § 33–993. Accordingly, building 6 was the only one as to which Sunland's notice and claim of lien was timely filed.

165 Ariz. at 600, 799 P.2d at 1374. Judge Ehrlich dissented from this portion of the opinion, finding that

> [t]his was a single project, the subject of a single contract to be executed in phases, and Sunland Drywall was entitled to protect itself through a single lien over all of the buildings on which it did work.

Id. at 603, 799 P.2d at 1377.

We granted Sunland's petition for review to decide whether the subcontractor's mechanic's lien on this multi-building condominium project was timely when filed within sixty days of the last work performed on the project.

DISCUSSION

Mechanics' liens are creatures of the governing statutes. 53 Am.Jur.2d Mechanics' Liens § 2 (1970 & Supp.1991). We must first determine, therefore, whether the Arizona statute permits a single lien to be filed on a multi-building condominium development. If the statute permits such a lien, the next question is whether the development was built as a single project or whether different phases of construction were contemplated as distinct and separate projects. See Northwest Fed. Sav. & Loan v. Tiffany Constr. Co., 158 Ariz. 100, 101,

---

**1.** The effect of the bond, when recorded, was to discharge the real property of the lien and provide for recovery, if any, to be satisfied from the bond. See A.R.S. § 33–1004.

761 P.2d 174, 175 (Ct.App.1988). If the development was a single project, a single lien is generally appropriate, with the time for filing the notice and claim of lien running from the date of the last work on the project; if not, separate liens, with different filing dates, are normally required. *See generally* Annotation, *Mechanic's Lien for Work on or Material for Separate Buildings of One Owner,* 15 A.L.R.3d 73, 237–38 (1967).

**A. Can a multi-building development be an "improvement" under the statute?**

The mechanic's lien statutes, A.R.S. § 33–981 *et seq.,* give those who furnish labor or materials to enhance the value of another's property the right to place a lien on the property for the value of the improvements. *Wahl v. Southwest Sav. & Loan Ass'n,* 106 Ariz. 381, 385, 476 P.2d 836, 840 (1970). The statutes are remedial and should be liberally construed to effect their purpose. *Id.* The procedure to perfect a mechanic's lien is set forth in A.R.S. § 33–993. Subsection (A) provides that every person, other than the original contractor, "claiming the benefits of this article, within sixty days after the completion of a building, structure or *improvement* ... shall" record a notice and claim of lien (emphasis added). Thus, we must first determine whether a multi-building development may be considered an "improvement" for the purpose of A.R.S. § 33–993(A).

Other states that have considered this issue have held that condominium developments constitute a single work of improvement. *See* 9 CONSTRUCTION LIT.REP. 148 (1988) (citing *E.D. McGillicuddy Constr. Co. v. Knoll Recreation Ass'n,* 31 Cal.App.3d 891, 107 Cal.Rptr. 899 (1973); *Southern Colonial Mtg. Co. v. Medeiros,* 347 So.2d 736 (Fla.App.1977); *Habitat v. McKanna,* 523 S.W.2d 787 (Tex.App.1974)); *see also Bloomington Elec. Co. v. Freeman's, Inc.,* 394 N.W.2d 605 (Minn.App. 1986) (subcontractor who performed electrical work on condominium project had valid

lien against project that was timely filed within ninety days of the last work, skill, material, or machinery provided). We recognize, of course, that decisions from other jurisdictions are persuasive only when the other state's mechanic's lien statute is comparable to our own.

The Texas statute, under which the *Habitat* case was decided, is very similar to ours. The analogous provision for placing the lien provides that the lienor shall, within ninety days, give notice to the owner of the house, building, or *improvement* for which the labor and materials were furnished. Tex.Rev.Civ.Stat.Ann. § 5453 (Vernon 1958 & Supp.1991).[2] Section 5452 defines "improvement" broadly but does not specify that it may include multi-building projects. The court in *Habitat* noted the general rule that "if the improvement is made under an entire contract for the whole and is located on one body of land, it is one improvement, though there are several separate structures." 523 S.W.2d at 789 (quoting 38 Tex.Jur.2d § 47, at 604). The court then found that because the plumbing contractor and the owner entered into a single contract covering all forty-two townhouses in a development, the contractor had a valid lien on all forty-two lots. *Id.*

Arizona case law supports reading the term "improvement" to encompass a multi-building project. In *Lewis v. Midway Lumber, Inc.,* the court of appeals defined improvement as a "catch-all" term that refers to the "subject of construction," specifically, a "valuable addition or betterment to real estate such as a building, clearing, drain, fence, etc." 114 Ariz. 426, 430, 561 P.2d 750, 754 (Ct.App.1977). The term "improvement" is broad enough to encompass a multi-building project that is, in fact, a "single project." *Wahl v. Southwest Sav. & Loan Ass'n,* 12 Ariz.App. 90, 95, 467 P.2d 930, 935 (1970) (court of appeals affirmed trial court's finding that twenty-four building apartment project was "to be treated as one improvement, and ... recording within the specified time after the

2. Sections 5452–5456 were repealed in 1983, after the *Habitat* case was decided, when the Tex-

as property code was enacted. Tex.Rev.Civ.Stat. Ann. §§ 5452–5456 (Vernon 1958 & Supp.1991).

'completion' of the project was sufficient"), *vacated in part on other grounds,* 106 Ariz. 381, 476 P.2d 836 (1970).

Thus, where construction of a multi-building project constitutes a "single project," a single mechanic's lien may be filed on the project and is timely if filed within the statutory period dating from the time the last item of work was performed or the last material was furnished.[3] *See Gene McVety, Inc. v. Don Grady Homes, Inc.,* 119 Ariz. 482, 484, 581 P.2d 1132, 1134 (1978) ("If work is done or materials furnished to complete the original contract, the time for filing the lien runs from the last furnishing of labor and materials."). Obviously, however, not every multibuilding development is built as a single project; in many cases, each building in a contemplated development may be a separate building, structure, or improvement for lien purposes.

### B. The single project theory

■ We turn, then, to the question of whether Sunland performed the drywall and stucco work on the condominium development as a single project. In *Gene McVety,* this court considered the single project theory in deciding whether a materialman had timely filed a lien against a subdivision when the lien was filed within sixty days of the project's completion but more than sixty days after its acceptance. The project in that case consisted of water and sewer improvements to a subdivision. Gene McVety supplied materials for the project as a whole, unaware that the work would be performed under two contracts between the owner and the contractor. This court found that the materialman had supplied materials to a single project, stating:

> It is, of course, the rule that two or more contracts cannot be tacked together so as to extend the time within which a lien notice must be filed.... This case is

not, however, governed by the foregoing rule. Where work, distinct in nature, is performed at different times, the law supposes that it is performed under distinct contracts. But when work is done or materials furnished, all going to the same general purpose, if the several parts form an entire whole or are so connected together as to show that the parties had it in contemplation that the whole would form but one and not distinct matters of settlement, the whole must be treated as a single contract.

*Gene McVety,* 119 Ariz. at 485, 581 P.2d at 1135 (citations omitted). This formulation hardly provides a bright line test.

■ Courts examine various factors to determine whether work was performed on a single project. Annotation, *Mechanic's Lien for Work on or Material for Separate Buildings of One Owner,* 15 A.L.R.3d 73, §§ 25–26 (1967). By far the most important factor, as this court noted in *Gene McVety,* is whether the work was performed pursuant to a single contract between the owner and the general contractor. As the Arkansas Supreme Court noted in *Burel v. East Arkansas Lumber Co.,* "although the lien is a creature of the statute, it must have its foundation in a contract, and on this account must correspond with the contract." 129 Ark. 58, 195 S.W. 378, 379 (1917).

Accordingly, most courts hold that where work is performed on several structures under a single contract, a single lien may be filed within the statutory period from the date of the last work performed or last materials supplied. *See, e.g., Cline-Hanson, Inc. v. Esselman,* 107 Wis.2d 381, 319 N.W.2d 829 (1982) (flooring subcontractor had single lien against three apartment buildings on three lots, which were treated as a single improvement under the contract between owner and general contractor).[4]

---

3. The parties in this case stipulated to the date of completion. *See* A.R.S. § 33–993(B); *cf. Egan–Ryan Mechanical Co. v. Cardon Meadows Dev. Corp.,* 169 Ariz. 161, 167–169, 818 P.2d 146, 152–154 (Ct.App.1990); *see also Union Rock & Materials Corp. v. Scottsdale Conference Center,* 139 Ariz. 268, 271–72, 678 P.2d 453, 456–57 (Ct.App.1983).

4. *See also Shepherd Plumbing & Heating Co. v. Bedford,* 273 Ala. 87, 135 So.2d 160, 162 (1961) (single contract for plumbing on six houses belonging to one owner); *Burel,* 195 S.W. 378

Conversely, courts generally hold that if work is performed under separate and distinct contracts, the claimant must timely file a lien under each contract. *See Arkansas Foundry Co. v. American Portland Cement Co.*, 189 Ark. 779, 75 S.W.2d 387, 390 (1934) (if materials furnished for construction of cement plant under one contract, timely if filed within ninety days after last delivery; if furnished under separate and distinct contracts, lien must be filed under each contract within time limit).[5]

Sunland argued in its motion for summary judgment that the multi-building project was an improvement for the purposes of A.R.S. § 33–993, and that its lien filed within sixty days of completing work on building 6 was timely as to the project as a whole. The trial court granted Sunland summary judgment. Minute Entry, March 16, 1988. The court of appeals' majority, however, conducted an exhaustive analysis of the administrative details of the Sunland contract, and concluded that the contract was in fact a series of separate contracts to complete work on and collect payment for each individual building. Thus, there was not a single improvement, and Sunland's lien was timely filed only

with respect to building 6. *S.K. Drywall*, 165 Ariz. at 600, 799 P.2d at 1374.

In examining the contractual relationship between the parties, we look first to the contract between the owner and the general contractor, which forms the basis for Sunland's mechanic's lien against the project. DFG and Drongo entered into a single contract to construct a multi-building condominium development for a lump sum. The lump sum was determined from a schedule of values detailing each category of the project and the prices assigned for the work and materials involved.

Sunland's drywall and stucco contracts mirror the structure of the DFG contract. Sunland agreed to do the drywall and stucco work on all of the buildings for lump sums to be paid as the work progressed. The contracts contained schedules detailing the value of the work for each building, as some buildings contained more units than others. The mere fact that a total contract sum is arrived at by assigning a value to each structure does not, in itself, turn a "single contract" into one severable as to each structure. *Will B. Miller Co.*, 140 S.W.2d at 378–79; *Cox*, 128 So. at 705; *Walden v. Robertson*, 120 Mo. 38, 25 S.W. 349, 350 (1894); *see also Parkway Estates*, 122 A.2d at 327. Rather, the overall con-

---

(single contract for construction of buildings on several lots); *Silvester v. Coe Quartz Mine Co.*, 80 Cal. 510, 22 P. 217 (1889) (single contract with mining company covered construction of several structures); *Will B. Miller Co. v. Laval*, 283 Ky. 55, 140 S.W.2d 376 (1940) (subcontractor furnished concrete work for twelve houses under a single contract for construction of houses on one tract of land); *Cox v. Rockhold*, 14 La.App. 170, 128 So. 702 (1930) (single contract for plumbing in ten houses on one tract of land); *Parkway Estates v. Burnham*, 210 Md. 64, 122 A.2d 326 (1956) (subcontractor plastered twenty-six houses pursuant to single contract to build twenty-six houses for owner); *Warner v. Fordham*, 246 Or. 200, 424 P.2d 673 (1967) (lien valid as to all lots when labor furnished in constructing houses was carried out in performance of a single contract); *Salt Lake Litho. Co. v. Ibex Mine & Smelting Co.*, 15 Utah 440, 49 P. 768 (1897) (lumber delivered under one contract for construction of several structures for a related purpose on a single parcel of land).

**5.** *See also Knauft v. Miller*, 45 Minn. 61, 47 N.W. 313 (1890) (subcontractor not entitled to single

lien when owner and builder had separate contracts for construction of buildings on separate lots); *United Masonry, Inc. v. Riggs Nat'l Bank*, 233 Va. 476, 357 S.E.2d 509 (1987) (court noted that result may have been different had owner engaged contractor in single contract to furnish labor and materials to condominium project, rather than three separate contracts for each phase of construction, each with separate consideration).

In certain circumstances, however, other facts may indicate that the work comprised a single project or transaction despite the existence of separate contracts—for example, where the contracts were with the same owner, the construction was for the same purpose, and the buildings were constructed on the same lot or on contiguous lots. *See generally* 53 Am.Jur.2d *Mechanics' Liens* § 258, at 788 (1970); *cf. Standard Lumber Co. v. Fields*, 29 Wash.2d 327, 187 P.2d 283 (1947) (materialman entitled to single lien where he had no knowledge that two contracts existed between owner and general contractor and he supplied materials for construction of a group of buildings on a single tract for a common purpose).

duct of the parties must be examined to see whether they intended to treat their agreement as a single contract or as severable. *Will B. Miller Co.*, 140 S.W.2d at 378–79.

DFG asserts that because the work was "performed and paid for on a building-by-building basis" and materials were supplied by Sunland to each building separately, Sunland was required to file a lien on each building. Response to Petition for Review at 8. Although billing statements were apparently generated for each building, both the DFG contract and the Sunland contract called for monthly progress payments based on ninety percent of the current month's completed labor, materials, and equipment costs. DFG admits that certain buildings were under construction simultaneously. Thus, according to the contracts, each month's progress payment could cover work on more than one building. Only the ten percent retention was tied to each building, payable within thirty days after occupancy of "any *unit* in a given building and not more than ninety (90) days after acceptance of each *building* by the owner." *S.K. Drywall*, 165 Ariz. at 590, 799 P.2d at 1364 (emphasis added).

We fail to see how these terms can be construed as representing payment on separate contracts on a per-building basis. Rather, it appears that the payment schedule was structured for administrative efficiency in an ongoing effort to complete the entire development. *Cf. Mathis v. Thunderbird Village, Inc.*, 236 Or. 425, 389 P.2d 343, 347 (1964) (In a case involving a mechanic's lien filed on supermarket project, the court noted that "[t]he contract contained a method of payment common to construction contracts. The contractor bills the owner at the end of the month for all work done during the month. The owner is obligated to pay 90 per cent of this amount within 10 days. The remaining 10 per cent ... is payable within 30 days after final completion.").

The terms of the DFG and Sunland contracts indicate that the parties believed work on the condominium development would be undertaken as a single project, executed in phases as the buildings were completed, with payment provided on a monthly basis. The development was on one tract of land and had a unified concept of use and design. The DFG contract obligates the developer to proceed with, and the contractor to complete, all eleven buildings in one continuous course of construction, specifying that the "work" required by the contract is "completion of the project" according to the relevant specifications. DFG Contract, Art. 1, Appendix to Response to Petition for Review. The estimated time for completion of the entire eleven-building project was listed as fourteen months. *Id.*, Art. 2.

The numerous details pointed to by the court of appeals, such as the delivery of building materials to each building rather than a common delivery site, the recording of a plat map for the condominium project, and the issuance of separate building permits and start orders for each building, are certainly not inconsistent with the concept that the contract was entire and nondivisible. Building permits are governed by city code requirements, and the issuance of start orders and the delivery of supplies are, as the dissenting judge in the court of appeals noted, merely "differing administrative details" of the overall contract. *S.K. Drywall*, 165 Ariz. at 603, 799 P.2d at 1377. Thus, taken as a whole, the terms of the DFG contract strongly support the single-project theory and the trial judge's consequent grant of summary judgment to Sunland.

## C. Equitable considerations

In enacting the mechanic's lien statutes, our legislature "intended that laborers and materialmen, who contribute of their labor and means to enhance the value of the property of another, should be jealously protected." *Wahl*, 106 Ariz. at 385, 476 P.2d at 840. Our holding that Sunland's contract was for a single project furthers this purpose without diluting the significant protection available to the property owner through both the statutory scheme and common practice.

The statutory scheme protects the property owner by requiring a person who has

begun to furnish labor or materials to notify the owner that a lien may be placed on the property if bills for those materials and services are not paid in full. A.R.S. § 33–992.01(C)(5). With notice of potential liens, the owner may protect himself from the risk of double payment by insisting on lien waivers. *See id.* Indeed, both the DFG contract and the Sunland subcontract contained provisions for furnishing lien waivers. *S.K. Drywall,* 165 Ariz. at 590–91, 799 P.2d at 1364–65.

The statute also protects property owners by requiring that mechanics' liens be filed within a specific period of time following the completion of construction. A.R.S. § 33–993(A). The purpose of the timely filing requirement is "to give the property owner an opportunity to protect himself and time to investigate the claim to determine whether it is a proper charge." *Lewis,* 114 Ariz. at 431, 561 P.2d at 755. Here, Sunland's single notice and claim of lien provided sufficient notice to DFG that Sunland had furnished labor and materials and had not been paid. In addition, DFG does not dispute the amount of Sunland's claim. Thus, the statute's purpose has been served under these facts.

Moreover, DFG entered into a single contract with Drongo for the construction of the entire condominium project. The initial determination of whether the development would be a single project or a series of projects was thus "a matter within the control of the property owner." *In re Waller Creek, Ltd.,* 867 F.2d 228, 235 (5th Cir.1989) (noting that "courts have looked to the owner's contractual arrangements for improvements on the property in order to determine whether the lien extends to the entire property"). DFG should have expected that if any sums were left unpaid under the contract, the project as a whole could be subject to a lien.

■ In contrast, the record reveals nothing that would have put Sunland on notice that work on each building would be furnished under a separate and distinct contract and that the condominium development was not a single project. A "mechanic's lien can be limited only when the contractor is able to determine which lot will stand as security for its construction efforts." *Waller Creek,* 867 F.2d at 235 (parking garage construction contract was separate and distinct from hotel construction contract). It must be "obvious from the context" of the agreement that the construction projects were "separate and distinct from one another," and the parties must have "treated them as such," before a court will decline to find that a lien extends to the entire property improved. *Id.* Sunland correctly filed a single notice and claim of lien on the project within sixty days of the last work done on the project.

A contrary result would lead to multiple problems. First, each case would turn on detailed and often unique facts. The court of appeals, for instance, distinguished the twenty-four building apartment complex in *Wahl* from the condominium development in this case by focusing on the differing administrative provisions in the contract, as well as on such ambiguous factors as whether the project had a common laundry facility and whether units would eventually be sold or rented. *S.K. Drywall,* 165 Ariz. at 598, 799 P.2d at 1372. This type of fact-specific analysis leads to confusion and uncertainty for both owner and contractor. As Sunland points out, such an analysis provides no clear way of determining whether a single filing would protect a contractor's rights in a multi-building office complex, resort hotel, or shopping center. Here it could be determined from the contracts themselves that the parties contemplated a single development project.

Second, under the court of appeals' approach, prudent contractors would be forced to file separate liens as each building or unit is completed in order to ensure their timeliness. Aside from the inconvenience to potential lienors, this process would require courts to handle multiple actions on successive phases of the same contract and/or project. In this case, for example, Sunland would have had to record a mechanic's lien on the first building completed and file an action to foreclose on

that lien, all while continuing to work on the last building.[6]

Finally, under both the contract and the subcontract, the ten percent retentions on a given building could be withheld for up to ninety days after DFG accepted the building. If, as the court of appeals held, Sunland was required to record its lien within sixty days of completing a given building, the limitations period for foreclosing the lien could begin to run even before the retention was payable under the contract. We believe such results to be inconsistent with the intent of A.R.S. § 33–993 and the case law interpreting this statute.

## CONCLUSION

A multi-building condominium development may constitute a single improvement within the meaning of A.R.S. § 33–993(A). When construction on the development was contemplated as a single project, a contractor is entitled to file a single lien within the statutory period after the last work is performed on the development. The development in question was an improvement within the contemplation of the mechanic's lien statute and was a single project involving construction of a multi-building condominium complex. Sunland properly filed its mechanic's lien within sixty days after the last work was performed on the project.

We vacate that portion of the court of appeals' opinion holding Sunland's lien untimely with respect to each building except building 6. We affirm the trial court's judgment that the lien was timely as to all buildings listed in Sunland's notice and claim of lien.

GORDON, C.J., and CAMERON, MOELLER and CORCORAN, JJ., concur.

---

**6.** Building 7 was completed on May 5, 1986. Under the court of appeals' holding, Sunland would have had to record its lien on building 7 within sixty days, or by approximately July 5. The mechanic's lien statute limits the time for foreclosure of a mechanic's lien to six months from the date of recording. A.R.S. § 33–998. In this case, then, Sunland would have had to foreclose on building 7 by approximately January 5, 1987, but Sunland was working on building 6 until January 9, 1987.